Filed 10/14/25  D'Alessio Investments v. Superior Court CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| D'ALESSIO INVESTMENTS, LLC, | |
| Petitioner, | |
| v. | G065064 |
| THE SUPERIOR COURT OF ORANGE COUNTY, | (Super. Ct. No. 30-2020-01133479) |
| Respondent; | O P I N I O N |
| CITY OF COSTA MESA et al., | |
| Real Parties in Interest. | |

Original proceedings; petition for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, David A. Hoffer, Judge. Petition denied.

Wanger Jones Helsley, John P. Kinsey, Hunter C. Castro and Jessica L. Vived for Petitioner.

No appearance for Respondent.

Jones Mayer and Krista MacNevin Jee for Real Party in Interest City of Costa Mesa.

No appearance for Real Parties in Interest Eric P. Beatty and JPMorgan Chase Bank, N.A.

Almost five years after the respondent court appointed a receiver to address, inter alia, substandard and illegal conditions at an apartment complex (the property) located in the City of Costa Mesa (the City) pursuant to Health and Safety Code section 17980.7, subdivision (c),[1] the court granted the receiver's motion to approve the plan to demolish the property and issue a second certificate of indebtedness in the amount of $540,000. The court concurrently denied the motion brought by the property's owner, D'Alessio Investments, LLC (D'Alessio), seeking permission to conduct discovery "into the receiver" and to submit a new rehabilitation plan to the City to resolve the underlying dispute.

D'Alessio filed a petition for a writ of mandate and/or prohibition challenging the respondent court's grant of the receiver's motion and denial of D'Alessio's motion. We issued an order to show cause. For the reasons we explain, we now deny the petition.

FACTUAL AND PROCEDURAL BACKGROUND[2]

I.

THE CITY CONDUCTS INSPECTION OF THE PROPERTY IN RESPONSE TO TENANT COMPLAINT ABOUT SUBSTANDARD LIVING CONDITIONS

"When the apartment complex was built in 1956, the property had five apartment units in two buildings. D'Alessio acquired the property in

---

[1] All further statutory references are to the Health and Safety Code unless otherwise specified.

[2] Quoted material in sections I and II are taken from the nonpublished prior opinion in this case, *City of Costa Mesa v. D'Alessio Investments, LLC* (July 17, 2023, G061011) (*D'Alessio Investments*), of which we take judicial notice. (Evid. Code, §§ 452, subd. (d)(1), 459.)

2

2015, at which time it consisted of 17 units in four buildings. In January 2019, the City received a complaint from a tenant about substandard living conditions. Code enforcement officers conducted inspections of 10 units at the property and observed numerous code violations. On February 1, 2019, the City wrote to D'Alessio, advising it had 'identif[ied] multiple code violations in several of the units,' requesting full access to all units for inspection, and asking for a response no later than February 11.

"On February 12, 2019, D'Alessio claimed in writing the City lacked probable cause to justify an inspection of every unit on the property and asked the City to provide a list of specific violations to be fixed. The City responded on February 20 that based on the previous inspections there was probable cause for a full inspection and again asked D'Alessio to agree to such an inspection. The City further stated, 'it is difficult to specify each fix required unless an inspection is done.'

"The City obtained an inspection warrant, and code enforcement officers conducted a full inspection in March 2019 along with the City's Chief of Building Inspection, a fire code enforcement officer, and a deputy city prosecutor. They identified multiple violations of the Costa Mesa Municipal Code and the California Health and Safety Code. The City issued a residential notice of violation to D'Alessio on April 16, 2019; the notice of violation specified compliance dates ranging from 'immediately' through May 16, 2019. The notice of violation included reference to the property's violation of zoning, planning, and building regulations, concerning the illegal subdivision of the property's approved units. On May 7, D'Alessio provided a response to each item on the notice of violation. As to the violations based on improper subdivision of the property, D'Alessio stated it needed copies of building documents from the City in order to address these violations.

3

"On May 6, 2019, the City received an anonymous complaint about unpermitted work being performed at the property. After an inspection the same day, the City immediately issued a civil citation and a stop work order, and on May 8 issued a notice of citation requiring compliance by May 18.

"On August 12, 2019, the City reinspected the property with D'Alessio's consent. The City found some of D'Alessio's corrections had been done improperly. The illegal work that was the subject of the stop work order and citations in May had been completed without permits and the stop work order had been removed from where it had been posted. The City therefore issued and posted a notice to abate on November 13, citing and quoting specific provisions of the Costa Mesa Municipal Code, the California Building Code, and the Health and Safety Code. The City's notice required the property be brought into compliance by November 16. D'Alessio requested the City 'clarify the violations.' On November 27, the City responded with a letter containing eight and one-half pages of specific violations of law. The letter noted the majority of these violations had been identified on the notice of violation issued in April 2019. Both the notice to abate and the November 27 letter referenced the illegal subdivision of the property's approved units by citing the applicable zoning, planning, and building regulations. The City provided D'Alessio until December 6 'to bring the Property into full compliance with the law.'

"On December 11, 2019, the City served on D'Alessio a notice of intent to file a petition for an order to abate and for appointment of a receiver pursuant to . . . section 17980.7. D'Alessio again requested a list of specific violations and stated it 'want[ed] to cooperate with the City.' D'Alessio and the City exchanged multiple communications regarding the violations at the

4

property. On January 24, 2020, the City's counsel wrote to D'Alessio's counsel: 'It is clear that your client's view differs from the City's and at this point the City will be proceeding with its case.'" (*D'Alessio Investments, supra*, G061011, fn. omitted.)

In February 2020, the City filed a petition for an order to abate for appointment of a receiver. (*D'Alessio Investments, supra*, G061011.)

II.

THE RESPONDENT COURT INITIALLY APPOINTS A RECEIVER FOR LIMITED PURPOSES AND THEN APPOINTS A RECEIVER FOR THE PROPERTY WITH ALL AUTHORITY AND DUTIES UNDER SECTION 17980.7

"On August 14, 2020, [respondent] court appointed a receiver 'for the limited purpose of inspecting the property and reporting back to [the c]ourt conditions of such nature that the health and safety of residents or the public is substantially endangered. The report shall also include a ballpark estimate of remediation costs.' The limited purpose receiver submitted reports on September 29, 2020 and November 4, 2020." (*D'Alessio Investments, supra*, G061011.)

In his first report filed in September 2020, the receiver stated D'Alessio had modified the property, without permits, to further increase the number of dwelling units to 19 dwelling units. The receiver explained the unpermitted modifications invalidated certificates of occupancy for two of the buildings at the property, and rendered the buildings at the property public nuisances, substandard as defined in section 17920.3, and untenantable as defined in Civil Code section 1941.1. The receiver also reported health and safety issues at the property and had observed conditions at the property which were an immediate health hazard.

5

In his second report filed with the respondent court in November 2020, some of the conditions previously reported had been addressed, but others had not.

On October 4, 2021, the respondent court granted the City's petition for an order to abate and appointed the receiver. In its minute order, the court explained:

"[The] City argues that conditions at the property substantially endanger the health and safety of residents based on both illegal subdivisions to increase the number of units therein and other conditions at the property.

"A receiver was initially appointed for the limited purpose of inspecting the property and reporting back to the court as to conditions of such nature that the health and safety of residents or the public was substantially endangered. On 9/29/20, the receiver reported that he had concluded that the property was entitled to only [nine] residential dwelling units per Conditional Use Permit ZE-76-193, yet it had been modified without building permits or planning approval to create 17 residential units. He also stated that regardless of condition, 'unpermitted dwelling units are a public nuisance, untenantable and illegal for occupancy as a matter of law.' He also observed conditions in the property which were an immediate health hazard and other safety issues. In his second report, the receiver stated that some of those other conditions had been addressed, but others had not.

"After allowing and considering the supplemental briefing[,] . . . D'Alessio continues to assert that 17 units were allowed by [the] City and has presented documents and the opinion of a retained architect . . . to support that assertion. But [the] City states that this is not so, and the receiver concluded unequivocally that the evidence does not support that claim.

6

"[D'Alessio] also asserts that all violations identified within the property to date have been addressed and that [D'Alessio] is prepared to address any further repairs which may be needed. But, as respondent's position continues to be that the number of units in place should be allowed to remain, he still has not shown that he has, can, or will address the primary violation at issue. The court thus finds that the [first amended petition] should be granted."

The respondent court signed a formal written order granting the petition on November 5, 2021, finding the property to be a nuisance and with violations and substandard conditions so extensive and of such a nature to substantially endanger the general public. The court ordered the receiver to take possession of the property and prepare a plan of rehabilitation for the property.

D'Alessio filed a notice of appeal from the respondent court's November 5, 2021 order. A panel of this court affirmed the order, rejecting D'Alessio's argument it had been denied due process because it did not have a reasonable opportunity to rehabilitate the property itself or that its constitutional rights were otherwise violated by appointment of the receiver. (*D'Alessio Investments*, G061011, July 17, 2023.) This court also held the City had provided D'Alessio more than a reasonable opportunity to address the identified problems at the property. (*Ibid.*)

III.

THE RECEIVER'S THIRD REPORT

The receiver's third report was filed on January 25, 2022. In that report, the receiver stated that in preparation of his rehabilitation plan and cost estimates, he asked the City and D'Alessio to respond to questions on their positions regarding a number of issues about the determination of the

scope of the rehabilitation of the property. Both parties responded. After independently assessing the relevant facts and law, the receiver concluded there are no lawful dwelling units on the property.

The receiver reported that at the time, the "lawful course of rehabilitation for the property is its reconstruction as a six-unit apartment development with one accessory dwelling unit." He explained that pursuant to Costa Mesa Municipal Code section 23-203, "if a nonconforming development or portion of development containing a nonconforming use becomes physically unsafe or unlawful" and is declared unsafe, it shall not be restored, rebuilt, or repaired "except in conformity with the regulations of the district in which it is located." The receiver further explained the City had declared the property unlawful and unsafe as a result of D'Alessio's "failure to properly repair and maintain the property and the unpermitted modifications" to the four buildings. Pursuant to the Costa Mesa Municipal Code, the property was entitled to one dwelling unit per 3,000 square feet of lot. The property is comprised of 18,415 square feet.

The receiver noted that "even if the City were to permit the receiver to restore the property to eight dwelling units and one [accessory dwelling unit], the property is not large enough to meet the City's off-street parking requirements." Section 13-85 of the Costa Mesa Municipal Code would require 18 parking spaces on the property.

The receiver requested that the respondent court instruct him to prepare a rehabilitation plan and cost estimate for the property to rehabilitate it to contain six dwelling units and one accessory dwelling unit and comply with the City's off-street parking requirements. The receiver also requested that the court instruct him to terminate all tenancies at the property and prepare a plan to provide meaningful relocation assistance to

8

the property's occupants given the unpermitted dwelling units were a public nuisance, untenantable and illegal for occupancy as a matter of law.

On May 26, 2022, the respondent court approved the receiver's relocation plan.

IV.

THE RECEIVER'S FOURTH REPORT

In the receiver's fourth report dated April 12, 2023, the receiver informed the respondent court that in his opinion, the demolition and removal of existing improvements at the property was the only economically feasible course of rehabilitating the property. The receiver explained the unpermitted modifications to the property had significantly impaired its value as the certificates of occupancy for two of the buildings had become invalid, and the property lost its entitlement as a lawful nonconforming development. Consequently, he explained, improvements moving forward had to be consistent with the City's then current R2-HD zoning designation and related design standards. He explained the property could then no longer lawfully contain eight dwelling units and an office but six dwelling units and one accessory dwelling unit.

The receiver explained rehabilitation of the property required decreasing the number of building units from 19 unpermitted dwelling units to six lawful units and one accessory dwelling unit. In doing so, its reconstruction had to comply with all current code requirements, and given significant changes in the California Building Standards Code and the California Residential Code with respect to structural framing and seismic performance since buildings B, C, and D were constructed, it would likely be cost prohibitive to so reconstruct them. In any event, in his estimation, it was unlikely the property could be rehabilitated to comply with the City's off-

9

street parking requirements for 22 vehicles (6 covered, 13 uncovered, and 3 guest parking spaces) for the property as reconstructed to consist of six dwelling units and one accessory dwelling unit.

The receiver further reported he performed an assessment of the value of the property if rehabilitated to consist of a seven-unit residential development and as a vacant lot (following demolition) ready for development. He retained commercial real estate brokers, Tom Holland and Josh Rhee of Kidder Matthews (the brokers), to assess the property's market value; the brokers' opinion of value was attached to the report. He also obtained a survey and design services proposal by Artoo Design S2dio, Inc. and a demolition proposal from demolition contractor LDR Golden, Inc., which proposals were attached to his report.

In addition, the receiver reported his participation in a conference call on March 29, 2023, with Dennis D'Alessio of D'Alessio, counsel for the City, and counsel for JPMorgan Chase for the purpose of reviewing certain building plans which D'Alessio prepared and claimed reflected a feasible plan for rehabilitation of the existing buildings at the property. The receiver reviewed D'Alessio's conceptional rehabilitation plans and documentation. At the receiver's request, the City arranged for representatives of its development services department to meet with the receiver on April 6, 2023, to review D'Alessio's conceptional rehabilitation plans and respond to a number of questions from the receiver concerning those plans.

The receiver thereafter concluded D'Alessio's conceptual rehabilitation plans did not represent a realistic or economically viable course of rehabilitation for the property. He determined, inter alia, the plans were predicated on D'Alessio's incorrect but persistent belief the property was still

10

entitled as a lawful nonconforming development, which could be rehabilitated to contain more units than are permitted by the R2-HD zoning designation. They were also predicated on D'Alessio's incorrect belief the unpermitted modifications to the buildings could be simply removed without the necessity of any other repairs or reconstruction if existing buildings were to remain in place.

V.

THE COURT APPROVES THE DEMOLITION PLAN, ISSUES A SECOND CERTIFICATE OF INDEBTEDNESS, AND DENIES D'ALESSIO'S MOTION TO CONDUCT DISCOVERY AND SUBMIT A NEW REHABILITATION PLAN

On August 5, 2024, D'Alessio filed a motion for leave to "conduct discovery on the receiver"; permission for D'Alessio to submit its rehabilitation plans to the City for review and approval; and an order increasing the amount of the receiver's undertaking (D'Alessio's motion). On October 25, 2024, the receiver filed a motion for an order approving the receiver's amended rehabilitation plan to demolish the property and the receiver's cost estimate and authorizing the receiver to issue a second certificate of indebtedness in an amount not exceeding $540,000 (the receiver's motion). The motions were heard together.

In a minute order dated December 9, 2024 (the December 9, 2024 minute order), the respondent court granted the receiver's motion and authorized issuance of a $540,000 second certificate of indebtedness, noting the request was reasonable, given the work proposed, and D'Alessio had not shown otherwise.

As for D'Alessio's motion, the respondent court granted D'Alessio's request to increase the receiver's bond from $10,000 to $50,000. The balance of D'Alessio's motion, however, was denied.

11

## VI.

### THE PETITION FOR WRIT OF MANDATE AND/OR PROHIBITION

On January 3, 2025, D'Alessio challenged the December 9, 2024 minute order by filing a petition for writ of mandate and/or prohibition. In the petition, D'Alessio requested that this court issue a writ of mandate directing the respondent court to (1) vacate its order granting the receiver's motion in its entirety and denying D'Alessio's motion to the extent it requested permission to conduct discovery into the receiver and to submit a new rehabilitation plan to the City; and (2) enter an order denying the receiver's motion and granting D'Alessio's motion in full.

On January 9, 2025, the respondent court imposed a stay pending resolution of this proceeding. On January 24, 2025, the City, as the real party in interest, filed a preliminary opposition and, on February 3, 2025, D'Alessio filed an informal reply.

This court issued an order to show cause why mandate or other appropriate relief should not issue. We invited the City to file a formal return to the petition, and invited D'Alessio to file a formal reply thereafter. The City filed a formal return and D'Alessio filed a formal reply accordingly.

### DISCUSSION

### I.

### THE RESPONDENT COURT DID NOT ERR BY GRANTING THE RECEIVER'S MOTION

D'Alessio argues the respondent court abused its discretion by granting the receiver's motion because (1) insufficient evidence supports its finding the demolition of the property's structures in preparation for the property's development was the "'only economically feasible option'"; (2) the court applied incorrect legal standards in granting the receiver's motion; and (3) insufficient evidence supports the court's issuance of a second certificate of

12

indebtedness in the amount of $540,000. For the reasons we explain, D'Alessio's arguments are without merit.

*A. Governing Legal Standards*

"The order authorizing the receiver to contract for demolition rests upon the court's 'sound discretion exercised in view of all the surrounding facts and circumstances and in the interest of fairness, justice and the rights of the respective parties. [Citation.] The proper exercise of discretion requires the court to consider all material facts and evidence and to apply legal principles essential to an informed, intelligent, and just decision. [Citation.] Our view of the facts must be in the light most favorable to the order and we must refrain from exercising our judgment retrospectively.' [Citations.] Where there is no evidence of fraud, unfairness, or oppression, the court has wide discretion in approving the receiver's proposed actions." (*City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 931 (*City of Santa Monica*).)

"Typically, however, court rulings on receivership matters are afforded considerable deference on review. [Citations.] Such deference is the rule, even where the court confirms extraordinary action by the receiver, such as a sale of real property. [Citation.] Because the highly deferential standard is appropriate for court decisions that are drastic enough to extinguish an owner's interest in property, we find it equally appropriate for decisions pertaining to the demolition of substandard structures that pose a

substantial health and safety risk." (*City of Santa Monica, supra*, 43 Cal.4th at p. 931.)

## B. The Respondent Court's Finding the Receiver's Demolition Plan Was the Most Economically Feasible Option Is Supported by Substantial Evidence

In the petition, D'Alessio argues: "Although the receiver's motion included more than 600 pages of materials, those papers contained no substantive, admissible evidence relevant to a determination of whether the property can be rehabilitated or the cost-effectiveness of rehabilitation." Broadly arguing the order approving the demolition plan "was wholly unsupported by admissible evidence," D'Alessio states the respondent court "chose to assume facts in the absence of substantial evidence."

D'Alessio's suggestion the receiver presented inadmissible evidence in support of the receiver's motion is unfounded. In its petition, D'Alessio does not contend it ever presented evidentiary objections to the respondent court with respect to any evidence presented by the receiver, much less argue in its petition the court made an erroneous evidentiary ruling.

In the December 9, 2024 minute order, the respondent court explained the basis for its approval of the receiver's plan: "The court can authorize demolition where the evidence shows that to be the only economically feasible option. [Citation.] The receiver here has shown that demolition is the only economically feasible course of rehabilitation for the property. [Citation.] [¶] [D'Alessio] argues that it has the resources for an alternate remediation proposal, which should be further considered by the City. [Citations.] But as the receiver has demonstrated in this motion, and as both the City and the receiver have demonstrated in opposition to [D'Alessio's motion], [D'Alessio] has not identified any feasible option to remediate the

14

property in a manner compliant with current code and zoning requirements. Moreover, given the unsafe condition of the property, any serious remediation plan would require a full reconstruction which, as the receiver points out, would be cost prohibitive. [D'Alessio] thus has not shown that there is in fact any economically feasible alternative to the receiver's proposal."

Substantial evidence supports the respondent court's finding that razing the property for development was the only economically feasible option presented. The court had before it evidence the receiver's proposed demolition plan would cost a total of $194,090. Specifically, demolition of the buildings and related improvements would cost $103,830, according to the estimate of LDR Golden, and it would cost another $90,260 for necessary surveys, asbestos abatement, perimeter fencing, permits, and miscellaneous expenses, pursuant to the estimates provided by other service providers identified by the receiver.

As for the costs of reconstructing the property, the respondent court had before it the conceptual cost estimate prepared by consultant Tim Arnold, owner of general contractor Kenneth D. Arnold & Associates. In that estimate, Arnold stated it would cost approximately $3.5 million to rehabilitate the property as a seven-unit residential development. The estimate provided: The stated purpose of the conceptual cost estimate was to "assist in a determination of the economic feasibility of rehabilitating the existing structures and improvements to render them compliant with all applicable laws, with all required plans and permits, utilizing the structures to obtain the maximum number of legal units given its zoning designation."

With respect to the rehabilitation of the property's buildings, the estimate's conceptual scope of work description included the following tasks: demolishing interior drywall "down to studs to repair or replace damaged

15

framing"; demolishing and replacing exterior stairs and landings; remodeling kitchens and bathrooms; replacing mechanical, electrical, and plumbing systems; adding insulation, replacing all windows and exterior and interior doors; "verify[ing] or replac[ing] roofing material, roof penetrations, [and] ventilation"; "verify[ing] existing foundation meets current code as required by the City"; adding any needed "footings with proper steel"; replacing exterior railings and guard rails; "verify[ing] or replac[ing] fire rated drywall to meet fire separation and current code" in garages; and replacing water heaters and countertops in the laundry area. With respect to the remaining areas of the property, the conceptual scope of work described the following tasks: (1) verifying and/or replacing damaged concrete or asphalt driveways and parking areas; damaged trash enclosures, doors, and coverings; and a free standing patio cover and (2) providing new landscaping material and irrigation to meet required city standards.

   The respondent court also had before it the brokers' opinion that the property had a market value of $3.45 million as a seven-unit residential development and a market value of $1.85 million as a vacant lot ready for development. D'Alessio argues the receiver lacked the credentials to claim the property's market value was between $1.6 million and $1.85 million. But as discussed *ante*, the receiver's proffered market values were not only based on the receiver's expert opinion, but on the brokers' estimate of value attached to the receiver's fourth report as exhibit "J." In that estimate of value, the brokers explained the estimated market value of the property as a development site for six dwelling units plus an accessory dwelling unit ranged from a high value of $1.85 million, to a medium value of $1.6 million, to a low value of $1.35 million. In their letter, the brokers recommended a list price of $1.85 million as a development site.

16

D'Alessio argues the respondent court erred by concluding the receiver's plan was the *only* feasible option because in opposition to the receiver's motion, D'Alessio provided estimates for two proposed rehabilitation plans it claimed it could also finance, which would "increase the property's value above $5,100,000 for a fraction of the cost." D'Alessio argues "even combined, [D'Alessio's] two rehabilitation plans cost less than the $194,040 the receiver estimated as pure demolition cost."

D'Alessio submitted two alternative reconstruction plans. In support of its "ADU Plan," D'Alessio submitted the estimate of Good Measure Construction for the following work to be done at the property at a total cost of $71,520: painting and patching in all buildings, moving a kitchen from one building to another, removing certain doors and walls, installing two kitchens, and repairing a landing, a railing, loose kitchen cabinet doors, and dry wall in garages.

In support of its "S[B ]330" plan,[3] D'Alessio submitted the estimate of Good Measure Construction for the following work to be done at the property for a total cost of $27,480: painting and patching in all buildings, moving a kitchen from one building to another, removing two doors and a frame, adding kitchen cabinets to another kitchen, and repairing a landing, a railing, loose kitchen cabinet doors, and dry wall in garages.

It was well within the respondent court's discretion to find that neither of D'Alessio's proposed plans, albeit each proposing a much lower cost

---

[3] Senate Bill No. 330 (2019–2020 Reg. Sess.) (SB 330) provided "housing development projects" with enhanced streamlining and vesting opportunities in order to facilitate increased building of residential units and to protect existing residential units within California. (Gov. Code, § 65589.5, subd. (a)(2).)

17

than Arnold's conceptual estimate, was sufficient to remediate the property. (See *City of Santa Monica, supra*, 43 Cal.4th at p. 931 [trial court has wide discretion to approve receiver's proposed actions]; *McClain v. Kissler* (2019) 39 Cal.App.5th 399, 415 ["we defer to the trial court's assessments of credibility and the weight of the evidence and do not interfere with its determinations of these matters"].)

More than substantial evidence, in the forms of, inter alia, the brokers' estimate of value, LDR Golden's revised demolition bid, Arnold's conceptual estimate, and the receiver's expert opinion, support the respondent court's finding the receiver's amended rehabilitation plan for demolition was the only economically feasible option for rehabilitating the property under the circumstances presented. Given the scenario of rehabilitating the property to consist of six dwelling units and one accessory dwelling unit, substantial evidence supports the finding demolition would preserve $1.5 million in the property's value. Thus, sufficient evidence supports the court's finding it would likely cost more to restore the property's buildings and make other improvements to comply with legal standards than the property would be worth post restoration.

*C. The Record Does Not Show the Respondent Court Was Laboring Under Any Misapprehension of the Law But Exercised Its Discretion In Light of All the Relevant Circumstances*

In the petition, D'Alessio argues the respondent court erred by applying incorrect legal standards in granting the receiver's motion. We address and reject each of D'Alessio's contention of legal error.

First, D'Alessio, citing *City of Santa Monica*, argues the respondent court should not have considered economic feasibility in granting the receiver's motion because "it is not the standard for determining the

18

validity of rehabilitation plans." In *City of Santa Monica, supra*, 43 Cal.4th at page 931, the California Supreme Court held an order authorizing a receiver to contract for demolition of property "rests upon the court's 'sound discretion exercised in view of all the surrounding facts and circumstances and in the interest of fairness, justice and the rights of the respective parties." In so exercising its discretion, our high court held, a court must "consider all material facts and evidence and to apply legal principles essential to an informed, intelligent, and just decision." (*Ibid.*)

In that case, the Supreme Court concluded a trial court could consider economic feasibility in considering a receiver's proposal to demolish substandard property. (*City of Santa Monica, supra*, 43 Cal.4th at p. 934.) Indeed, the court in that case found the trial court had acted well within its broad discretion in authorizing the receiver's pursuit of demolition, "especially in view of the economic information presented." (*Id.* at p. 934.)

Second, D'Alessio argues the City and the receiver misinformed the respondent court that the property's occupancy permits became invalid or were revoked, causing the court to "conclude the property would require 2024 code compliance as a new development, rendering rehabilitation economically infeasible." Pursuant to subdivision (b) of section 13-203 of the Costa Mesa Municipal Code: "If a nonconforming development or portion of a development containing a nonconforming use becomes physically unsafe or unlawful because of lack of repairs or maintenance and is declared by any duly authorized official to be unsafe or unlawful by reason of physical condition, it shall not thereafter be restored, repaired or rebuilt except in conformity with the regulations of the district in which it is located."

D'Alessio does not challenge the property's legal nonconforming status. D'Alessio does not challenge the fact the City declared the property's

nonconformity became physically unsafe or unlawful because of the lack of repair or maintenance. Indeed, the property was in such a state of dangerous disrepair, all tenants had to be removed and relocated off site. Consequently, the Costa Mesa Municipal Code requires that the property may only be repaired or rebuilt to conform with *current* legal standards.

Finally, D'Alessio argues the order granting the receiver's motion "violates public policy and state and local housing laws." He argues that over the course of the receivership, laws, such as the Housing Crisis Act of 2019 (Gov. Code, § 66300 et seq.) and its amendments have resulted in increased urban residential dwelling density allowances. Consequently, according to D'Alessio, current law might now permit up to as many as 18 dwelling units on a parcel that is the same size as the property in the instant case, plus accessory dwelling units, whereas earlier in the receivership, applicable law countenanced a maximum of six units. D'Alessio's argument suggests such changes in the law forced the respondent court's hand by precluding the court from approving the receiver's motion and requiring it to force the City to further consider D'Alessio's vague conceptions of an SB 330 rehabilitation "plan."

D'Alessio offers no legal analysis or citation to authority showing that SB 330 and its amendments have any application to property in receivership or explaining how any such laws might limit the panoply of options available to the respondent court in the instant case. It is fundamental to appellate review "a judgment is presumed correct" and "all intendments and presumptions are indulged in favor of correctness." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.) It is also fundamental: "The one contesting [the judgment] thus bears the burden of showing legal error. That requires legal authority." (*Singman v.*

20

*IMDB.com, Inc.* (2021) 72 Cal.App.5th 1150, 1151.) "'This means that an appellant must do more than assert error and leave it to the appellate court to search the record and the law books to test his claim. The appellant must present an adequate argument including citations to supporting authorities and to relevant portions of the record. [Citations.]' [Citation.] Accordingly, the California Rules of Court expressly require appellate briefs to 'state each point . . . and support each point by argument and, if possible, by citation of authority' and to 'support any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears.' (Cal. Rules of Court, rule 8.204(a)(1)(B) & (C).)" (*L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 619–620.)

D'Alessio argues, in ruling on the parties' motions, the respondent court necessarily relied on the assumption rehabilitation would require new, cost-prohibitive construction of just six dwelling units and one accessory dwelling unit. Not so. At the hearing on the receiver's motion and D'Alessio's motion, the parties addressed the continuing changes in the law and how it would impact and likely increase the number of permitted dwelling units at the property. Furthermore, the court extensively questioned counsel on those changes. The court therefore was fully aware of that change in circumstance in evaluating the parties' respective motions. After considerable discussion, the court stated that it had considered and appreciated the parties' counsel's comments and Dennis D'Alessio's comments at the hearing. The court then stated:

"The property is . . . D'Alessio's property. But by virtue of the receivership, it's in the court's hands as to what to do at this stage. And as I said, I think to some extent we should all be on the same page. We want to maximize the value of this property.

21

"There's a lot of debt when it comes to this property. And it's been years now. And the court has understood that this day might come. Even at the time that I appointed the receiver, I knew this day might come, where the court might be asked to take a step like this.

"And . . . D'Alessio begs me not to order—to allow the receiver to go ahead with the receiver's plan, which is to raze the property. And I certainly hear that plea, both from counsel and from . . . D'Alessio, but from . . . D'Alessio personally.

"But I think if I were to do it, I would only be prolonging the inevitable. I really think that ultimately, ultimately it would cost too much to rehabilitate this property. . . . [¶] . . . [¶]

"Despite . . . D'Alessio's pleas, folks, I am going to adopt and confirm the tentative. It will be the ruling of the court. It does require an increased bond to protect the property owner. But it does permit the rehabilitation plan to go forward. . . .

"And the court has—as I said, the court is well aware of this property. I've seen many, many reports on this property, from the time of the receivership. [¶] . . . [¶]

"But I honestly think that, in all honesty, that it would take so much to try to bring this property back online. That it is better to start from scratch. And the only way to do that is to permit the demolition to go forward.

"As I said, it's—probably in the six years that I've been on the bench, this one is the one that I thought the most about. And yet we're strangely on the same page. It's just a disagreement about how to maximize the value of . . . D'Alessio's property."

Not only has D'Alessio failed to show the respondent court was laboring under any misapprehension of the governing law, he failed to show

the court in any way abused its discretion, particularly given the extensive amount of work that needed to be done to bring the property's conditions up to code, whether in the form of six dwelling units or 18. Although the receiver had produced estimates for market value, demolition costs, and reconstruction costs based on a six dwelling unit model, such evidence was sufficient for the court to infer the relative expense to value ratio for demolition versus reconstruction, regardless of the number of dwelling units at the property. D'Alessio does not argue otherwise. We find no error.

### D. D'Alessio Failed to Show the Respondent Court Abused Its Discretion by Issuing a Second Certificate of Indebtedness in the Amount of $540,000

In the petition, D'Alessio argues the receiver's request for the issuance of a second certificate of indebtedness in the amount of $540,000 lacked factual support, stating: "[The respondent court] granted the receiver's unconscionable request to extract another $540,000 from the property (with an unreasonable 5 [percent] origination fee and 12 [percent] interest rate) based on his bare assertion that it was 'reasonable and necessary.' [Citation.] [The court]'s statement that [D'Alessio] 'has not shown why that sum is not reasonable' flies in the face of [D'Alessio]'s motion and evidence demonstrating the receiver has repeatedly failed and/or refused to perform his duties, provide basic accountings, and has been accused of misusing funds. [Citation.] This determination was an abuse of discretion as a result."

Substantial evidence supports the respondent court's finding underlying its decision to issue the second certificate of indebtedness in the amount of $540,000. In support of his request for funding, the receiver stated the following under penalty of perjury: "As detailed in the receivership estate's revised operating budget (exhibit 'W' to the amended rehabilitation plan), it requires $540,000 in additional funding to complete the

23

rehabilitation of the property, to pay the outstanding property taxes, expenses incurred in re-securing, cleaning, repairing, maintaining and insuring the property and the administrative expenses of the receivership estate."

The receiver further stated: "Lender Receivership Lending, LLC, is willing to make a loan to the receivership estate in exchange for a second certificate of indebtedness, secured by a super-priority lien on the property, upon the following terms:

"Loan amount:          $540,000

"Term:                 six months

"Interest rate:        12 percent

"Origination fee:      5 percent."

(Capitalization omitted.)

The receiver further stated: "I respectfully submit that the terms set forth above are reasonable given the nature of the loan, the condition of the property, the scope and nature of the rehabilitation it requires and the risks associated with such a loan in the context of these proceedings."

Exhibit "W" to the "Amended Rehabilitation Plan" and cost exhibit itemizes the basis for the receiver's position of the total required funding in the amount of $540,000, identifying incurred and anticipated costs for security, fencing, trash removal, tree trimming, plumbing issues, demolition costs, surveys permits, property taxes, insurance, utilities, landscaping, loans and loan fees, rehabilitation consultant fees, and emergency repairs.

Such evidence is sufficient to support the respondent court's issuance of the second certificate of indebtedness in the amount of $540,000.

24

In any event, D'Alessio has failed to show how any challenge to this aspect of the court's ruling is appropriate for writ relief.

## II.

### THE RESPONDENT COURT DID NOT ERR BY DENYING D'ALESSIO'S MOTION SEEKING PERMISSION TO CONDUCT DISCOVERY "INTO THE RECEIVER"

D'Alessio argues the respondent court erred by denying its motion for, at a minimum, "expedited and limited discovery regarding the receiver's deficient filings and a formal review of [D'Alessio]'s S[B ]330 rehabilitation plans." In its minute order denying D'Alessio's motion with respect to its request for discovery, the court explained: "[D'Alessio] here has requested leave to conduct discovery through a deposition of the receiver. But it has not shown that this should be allowed here. A receiver is the agent of the court. [Citation.] A receiver is not entirely immune from responsibility for a failure to properly carry out the duties imposed by the order of appointment. [Citation.] [¶] [D'Alessio] alleges that the receiver failed to consistently issue monthly reports, as he was required to do. [Citation.] The receiver responds that he was quite ill for part of that time but has not explained the failure to issue such reports for the entire period at issue. However, the receiver has since presented an interim accounting, as to which [D'Alessio] has objected. [D'Alessio] can request explanations from the receiver on any particular charges that were not already presented, considered and approved. If any concerns remain, to the extent that any sums claimed by the receiver were not already presented, considered and approved, [D'Alessio]'s objections can be addressed in connection with the receiver's eventual request for discharge. In the interim, as good cause for conducting discovery as to the receiver has not been shown, that request is denied."

25

In the writ petition, D'Alessio does not explain how the respondent court's ruling constitutes an abuse of the court's discretion. (*Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 881 [standard of review for discovery orders is abuse of discretion].) More significantly, even if the court had abused its discretion in this respect, D'Alessio offers no analysis or citations to relevant legal authority how D'Alessio is entitled to writ relief in this respect. (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 205 [writ of mandate shall not issue simply to "control" the exercise of judicial discretion].) It was D'Alessio's burden as petitioner to demonstrate how its right to appeal the court's denial of discovery in this matter was inadequate. (See *Powers v. City of Richmond* (1995) 10 Cal.4th 85, 1113.)

III.
### THE RESPONDENT COURT DID NOT ERR BY DENYING D'ALESSIO'S MOTION SEEKING APPROVAL TO SUBMIT A NEW REHABILITATION PLAN TO THE CITY

Finally, D'Alessio contends the respondent court erred by denying its motion seeking approval to submit a SB 330 plan to the City for consideration. In its minute order denying D'Alessio's motion in that respect, the court explained: "[D'Alessio] has also requested permission to submit its alternate rehabilitation plans to [the] City for review and approval. But as both the City and the receiver have demonstrated in opposition to [D'Alessio's motion, D'Alessio] has not identified any feasible option to remediate the property in a manner compliant with current code and zoning requirements. As there is thus no proposal at issue which would present a viable alternative to the receiver's proposal, that request is denied."

As discussed *ante*, the respondent court considered D'Alessio's evidence and argument regarding further rehabilitation plans. The court did not abuse its discretion by denying D'Alessio's request to revisit that issue by

26

submitting them to the City for its consideration at this point in time. We find no error.

## DISPOSITION

The petition for a writ of mandate and/or prohibition is denied. The order to show cause is discharged. The stay imposed by this court is dissolved upon issuance of the remittitur. Real party in interest to recover costs on appeal.

MOTOIKE, ACTING P. J.

WE CONCUR:

MOORE, J.

SANCHEZ, J.